# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 19, 2012                    Decided January 4, 2013

No. 11-5288

ROBERT BENNETT, ET AL.,
APPELLANTS

v.

SHAUN DONOVAN, IN HIS CAPACITY AS SECRETARY OF THE
UNITED STATES DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00498)

*Jean Constantine-Davis* argued the cause for appellants. With her on the briefs were *Steven A. Skalet* and *Craig L. Briskin*. *Janell M. Byrd* entered an appearance.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Michael S. Raab* and *Mary L. Smith*, Attorneys.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Two widowed spouses of homeowners with reverse-mortgage contracts faced foreclosure by mortgage lenders after their spouses died. They brought suit against the Secretary of the Department of Housing and Urban Development, alleging that HUD's regulation defining the conditions under which it would insure a reverse-mortgage agreement was inconsistent with the applicable statute. The district court dismissed for lack of standing, but we reverse. The district court correctly reasoned that if relief for appellants' injuries depended on the independent actions of the lenders — deciding whether to foreclose or not — then appellants would lack standing. But after, perhaps, a more thorough presentation before us, we think that, assuming the regulation is unlawful, HUD itself has the capability to provide complete relief to the lenders and mortgagors alike, which eliminates the uncertainty of third-party action that would otherwise block standing.

I.

A "reverse mortgage" is a form of equity release in which a mortgage lender (typically, a bank) makes payments to a borrower based on the borrower's accumulated equity in his or her home. Unlike a traditional mortgage, in which the borrower receives a lump sum and steadily repays the balance over time, the borrower in a reverse mortgage receives periodic payments (or a lump sum) and need not repay the outstanding loan balance until certain triggering events occur (like the death of the borrower or the sale of the home). Because repayment can usually be deferred until death, reverse mortgages function as a means for elderly homeowners to receive funds based on their home equity.

Reverse mortgages are generally non-recourse loans, meaning that if a borrower fails to repay the loan when due, and if the sale of the home is insufficient to cover the balance, then the lender has no recourse to any of the borrower's other assets. This feature is, of course, favorable to borrowers but introduces significant risk for lenders — if regular disbursements are chosen, they can continue until the death of the borrower (like a life annuity), and the loan balance will increase over time, making it less and less likely that the borrower will be able to cover the full amount. If a borrower lives substantially longer than expected, lenders could face a major loss.

Congress, concerned that this risk was deterring lenders from offering reverse mortgages, authorized HUD to administer a mortgage-insurance program, which would provide assurance to lenders that, if certain conditions were met, HUD would provide compensation for any outstanding balance not repaid by the borrower or covered by the sale of the home. The Housing and Community Development Act of 1987 set out those conditions. The particular provision at issue in this case states:

> The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. *For purposes of this subsection, the term "homeowner" includes the spouse of a homeowner.*

12 U.S.C. § 1715z-20(j) (emphasis added). HUD promulgated regulations to implement the Act, which include the following provision establishing when insured loans become due and payable:

> The mortgage shall state that the mortgage balance will be due and payable in full if a mortgagor dies and the property is not the principal residence of at least one surviving mortgagor, or a mortgagor conveys all of his or her title in the property and no other mortgagor retains title to the property.

24 C.F.R. § 206.27(c)(1).

Robert Bennett and Leila Joseph are the surviving spouses of reverse-mortgage borrowers whose mortgage contracts were executed pursuant to HUD's insurance program. Only their spouses, not the appellants themselves, were legal borrowers under the mortgage contract. Appellants allege that they were assured by their brokers that they would be protected from displacement after their spouses died, and that in reliance on this protection, they quitclaimed interest in the homes they had owned jointly with their spouses when their mortgages were originated.[1]

Yet when appellants' spouses died, the respective lenders both asserted their right to immediate repayment of the loan. Their claim was based on language in the mortgage contracts stating that the balance became due and payable if "[a] Borrower dies and the Property is not the principal residence of at least

---

[1] Both Bennett and Joseph were younger than their respective spouses, and because loan limits depend on the age of the *youngest* borrower, quitclaiming interest in their homes likely allowed the banks to provide appellants more favorable loan terms than if they had been parties to the contract as well. Pricing of reverse mortgages is like the inverse of life-insurance policies — older borrowers are expected to live for a shorter period of time, and thus draw fewer payments over the life of the mortgage, so the magnitude of those payments can be greater for a given amount of equity.

one surviving Borrower."  Neither Bennett nor Joseph were "borrowers" under the mortgage contracts.  When appellants failed to repay the loans, the lenders initiated foreclosure proceedings.

Bennett and Joseph responded by filing suit against the Secretary of HUD in the District Court for the District of Columbia.  They asserted that HUD's promulgation of 24 C.F.R. § 206.27(c) was unlawful because insuring loans payable on the death of the last surviving *borrower* was inconsistent with 12 U.S.C. § 1715-z20(j), which protects "homeowners" from displacement and defines "homeowner" to include "spouse of the homeowner."  On appellants' view, whether or not a spouse is also a borrower is irrelevant.

The district court dismissed the complaint for lack of standing.  Bennett and Joseph could not show that a favorable outcome — that is, a declaratory judgment that HUD's regulation violated the statute — would redress this harm.  Even if HUD should never have insured these mortgages, the lenders now had a lawful right to foreclose under the mortgage contracts themselves, and that right did not depend on the legality of HUD's regulation.  The district court therefore concluded that this set of facts did not fall under any of the limited circumstances whereby redressability of a plaintiff's injury can be based on the actions of a regulated third party.

## II.

The issue on appeal is limited to appellants' standing.  But we admit to being somewhat puzzled as to how HUD can justify a regulation that seems contrary to the governing statute.  HUD explains that it is specially concerned about the scenario in which a homeowner, after taking out a reverse mortgage, marries a spouse — particularly a young spouse — and thereby

significantly increases a lender's risk.  It would seem, however, that HUD could legitimately deal with that problem by issuing a regulation defining a "spouse" as only a spouse in existence at the time of the mortgage.  Be that as it may, we turn to the standing question.

To further limit our focus, it is only the redressability component of Article III standing that is in dispute.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiffs must show that it is likely, and not merely speculative, that a decision in their favor will redress their injury).  There is no dispute that the risk of displacement upon foreclosure constitutes an injury in fact, and although the district court did not specifically determine causation, we see little reason to doubt that a causal connection exists between HUD's actions and appellants' harm.  Had HUD not issued its allegedly unlawful regulation — which insures mortgages that protect from displacement only surviving *borrowers* instead of surviving *spouses* — it is reasonable to assume that the lenders would not have executed contracts under these terms.

But redressability is a closer question because it is the private lenders, not HUD itself, that currently threaten foreclosure.  Bennett and Joseph point out that the lenders are heavily regulated by HUD and would decline to foreclose if HUD so suggested — HUD is the "900-pound gorilla" — and thus a declaratory judgment that HUD's regulation is unlawful would likely redress their injuries.  HUD argues that the lenders are independent decision-makers with respect to foreclosure, that they will have a legal right to foreclose (and economic incentive to do so) regardless of the outcome of this litigation, and therefore that any redress would be merely speculative.

Our seminal case discussing standing in the context of a regulated third party is *National Wrestling Coaches Ass'n v.*

*Department of Education*, 366 F.3d 930, 938 (D.C. Cir. 2004) ("When a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." (quoting *Lujan*, 504 U.S. at 562)). We held that men's wrestling organizations lacked standing to challenge interpretations of Title IX regulations that caused schools to eliminate or reduce the size of the their men's wrestling teams. *Id.* at 933. That was because, assuming the interpretations were unlawful, schools could still make their own decisions about whether to forego elimination of a wrestling team or to reinstate a disbanded program. Educational institutions were, in this respect, "truly independent of government policy." *Id.* at 941. Bennett and Joseph's case appears close to the facts of *National Wrestling*. Both cases involve third parties who took actions because of allegedly unlawful agency decisions, but who would have no compelling reason to reverse those actions were the decisions held unlawful by a court.

In that regard, the lenders have no pecuniary interest in withholding foreclosure, even if appellants prevailed on the merits. *Cf. Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135-36 (D.C. Cir. 2006) (public interest group had standing to seek to enjoin the FDA from enforcing a policy barring the sale of drugs to their members because drug companies would have clear financial incentives to sell their products). Bennett and Joseph claim that the lenders would not want to lose their HUD insurance and that foreclosing after a court finds the regulation unlawful would somehow effect this result. But appellants overlook 12 U.S.C. § 1709(e), which states that an insurance contract executed with HUD "shall be conclusive evidence of the eligibility of the loan or mortgage for insurance, and the validity of any contract of insurance so executed shall be incontestable in the hands of an approved financial institution . . . , except for fraud or

misrepresentation." The lenders thus have a statutory guaranty that their contracts will remain eligible for insurance, and no ruling on the validity of HUD's regulation will threaten this protection.

Indeed, HUD's own regulations actually *require* lenders to "commence foreclosure of the mortgage within six months of giving notice to the mortgagor that the mortgage is due and payable," 24 C.F.R. § 206.125(d)(1), or else HUD may withhold interest disbursements accordingly, *id.* § 206.129(d)(2)(iii). *See also id.* § 206.125(d)(3) (lenders "must exercise reasonable diligence in prosecuting the foreclosure proceedings to completion"). So not only would prompt foreclosure fail to forfeit the lenders' insurance, but maintaining that insurance actually requires it. To be sure, if the regulation was found unlawful, HUD could decline to enforce these requirements, which would give the lenders the option to withhold foreclosure without forfeiting their insurance. But that course would still leave the lender with an independent decision (and with no economic incentive *not* to foreclose).

Bennett and Joseph nevertheless insist that there is "substantial evidence of a causal relationship," *Nat'l Wrestling*, 366 F.3d at 941, between HUD and the lenders that participate in its reverse-mortgage program. Appellants explain how HUD has substantial control over most of the program's features, which in appellants' view, amounts to the conclusion that the lenders are not "truly independent of government policy." *Id.*

But the phrase "truly independent," as we used it in *National Wrestling*, does not refer to the general relationship between a third party and a government agency. The relevant question is whether a third party is independent of government policy *with respect to the action at issue in a particular case.* Here, that action is foreclosure according to the terms of a

lawfully executed mortgage contract, and in that respect, the lenders *are* independent of HUD's control. Insofar as the lenders maintain the right to foreclose, Bennett and Joseph would lack standing to bring suit against HUD.

* * *

It does appear to us, however, that HUD has additional statutory means to provide complete relief to both appellants and their lenders, and at least one such avenue of relief would remove speculation as to independent third-party actions. That statutory provision is 12 U.S.C. § 1715z-20(i). This subsection is titled "Protection of homeowner and lender" and states in relevant part:

> (1) "[I]n order to further the purposes of the program authorized in this section, the Secretary shall take any action necessary —

>> (A) to provide any mortgagor under this section with funds to which the mortgagor is entitled under the insured mortgage or ancillary contracts but that the mortgagor has not received because of the default of the party responsible for payment;

>> (B) to obtain repayment of disbursements provided under subparagraph (A) from any source; and

>> (C) to provide any mortgagee under this section with funds . . . to which the mortgagee is entitled under the terms of the insured mortgage or ancillary contracts authorized in this section.

> (2) Actions under paragraph (1) may include —

>  (A) *disbursing funds to the mortgagor* or mortgagee from the Mutual Mortgage Insurance Fund; [and]
>
>  (B) *accepting an assignment of the insured mortgage* notwithstanding that the mortgagor is not in default under its terms, and calculating the amount and making the payment of the insurance claim on such assigned mortgage . . . .

(emphasis added). Neither party's briefs explicitly discuss the precise text of this provision. Bennett and Joseph describe the statute as compelling HUD to "take any action necessary" to "further the purposes of the [reverse mortgage] program" — a reading that misleadingly characterizes HUD as having authority to take *any* action to further *any* purpose of the program, as opposed to authority to take *certain* actions to effect the *particular* goals listed in paragraph (1). HUD, unfortunately, ignores the provision almost entirely.

But notwithstanding appellants' limited presentation of the issue, they do suggest a means of relief that appears to fall within this subsection and also resolves their standing problem — HUD could accept assignment of the mortgage, pay off the balance of the loans to the lenders, and then decline to foreclose against Bennett and Joseph. Accepting assignment and disbursing funds are both actions specifically authorized by paragraph (2), and such actions could be used to satisfy the "trigger" condition in subparagraph (1)(C) — to provide lenders with funds to which they are entitled under their insured mortgages.

It might seem odd for the borrowers to benefit from a provision intended to protect the lenders,[2] but there is no doubt here that the lenders were entitled to further funds under their mortgage contracts. And, of course, if HUD were to accept assignment, it would be within its discretion as the holder of the contract to simply decline to foreclose. That this remedy would *also* benefit the borrowers is hardly a problem — and indeed, doing justice to § 1715z-20(j)'s intended protection for spouses would seem to "further the purposes of the program authorized in this section." *Id.* § 1715z-20(i)(1).

In sum, this remedy eliminates the uncertainty of third-party action, which likewise eliminates the redressability problem — if HUD took this series of steps, then HUD, and not the lenders, would be in the position of deciding whether to foreclose against Bennett and Joseph. To be sure, the statute does not make clear whether "accepting an assignment of the insured mortgage" requires the lender's consent. Yet, even assuming the lenders' agreement would be needed, it would clearly be in the lenders' "pecuniary interest," *Abigail Alliance*, 469 F.3d at 135, to receive the full balance of the loan immediately, rather than face the uncertainty and transaction costs of foreclosure. So even though this potential remedy might involve third-party conduct, there is no serious doubt as to how the lenders would respond.

We do not hold, of course, that HUD is *required* to take this precise series of steps, nor do we suggest that the district court should issue an injunction to that effect. Appellants brought a complaint under the Administrative Procedure Act to set aside an unlawful agency action, and in such circumstances, it is the

---

[2] Subparagraphs (A) and (B) — which give HUD authority to ensure that *mortgagors* receive funds due under their contracts — are irrelevant, because Bennett and Joseph were not actually entitled to any further funds under their contracts.

prerogative of the agency to decide in the first instance how best to provide relief. *See N. Air. Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").[3]

Perhaps HUD would provide the precise relief we have outlined, perhaps it would find another alternative, or perhaps it would decide no such relief was appropriate. We recognize that, even if the district court issues a declaratory judgment, appellants still have no *guaranty* of relief. Though of course, if Bennett and Joseph prevailed on the merits in the district court but were dissatisfied with HUD's remedy, they would always have the option to seek review on the ground that HUD's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The relevant question for standing, however, is not whether relief is *certain*, but only whether it is *likely*, as opposed to merely speculative. *Lujan*, 504 U.S. at 561. There would indeed be a problem of merely speculative relief were the lenders the only party with discretion not to foreclose, but § 1715z-20(i) gives HUD the tools to remove this uncertainty. HUD is the government actor alleged to have caused appellants' injury, and HUD is the actor that can provide relief — that arrangement is sufficient to establish that relief is likely.

---

[3] *Northern Air Cargo* was not technically an APA case because the Postal Service is exempt from APA review, 674 F.3d at 858, but the same principle applies regardless.

Because we decide that appellants have standing, we need not consider their alternative argument that the district court abused its discretion in denying them leave to amend their complaint. The judgment of the district court is reversed, and we remand for proceedings consistent with this opinion.

*So ordered.*