[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14677
_____

D.C. Docket No. 1:17-cv-03105-TWT

THE ESTATE OF CALDWELL JONES, JR.,
EXECUTRIX VANESSA JONES,
VANESSA JONES,
Surviving Spouse in Her Individual Capacity and as
guardian of Leah Grace Jones,
LEAH GRACE JONES,
Minor,

Plaintiffs - Appellants,

versus

LIVE WELL FINANCIAL, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 5, 2018)

Before WILSON and NEWSOM, Circuit Judges, and VINSON,[*] District Judge.

NEWSOM, Circuit Judge:

This case arises out of the foreclosure of a home-equity conversion mortgage—commonly called a "reverse mortgage." We are asked to interpret a federal statute, 12 U.S.C. § 1715z-20, which authorizes the Secretary of the Department of Housing and Urban Development to establish a mortgage-insurance program designed to encourage lenders to offer reverse mortgages and thereby alleviate some of the financial pressures faced by elderly homeowners. *Id*. § 1715z-20(a). The particular provision at issue here states that the HUD Secretary "may not insure" a reverse mortgage unless it defers repayment obligations until the borrowing "homeowner" either dies or sells the mortgaged property—and importantly, expressly defines the term "homeowner" to include the borrower's spouse. *Id*. § 1715z-20(j).

The question before us is whether § 1715z-20(j) can be read to do more—specifically, to prevent foreclosure pursuant to a reverse-mortgage contract that, by its terms, permits the lender to demand repayment immediately following a borrower's death, even if his or her non-borrowing spouse continues to live in the mortgaged property. We hold that it cannot be construed so broadly. Because the statute addresses and limits only the Secretary's authority—specifying the types of

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

mortgages that HUD "may not insure"—it does not alter or affect the rights that a lender independently possesses under a reverse-mortgage contract.

## I

A reverse mortgage is a financial instrument designed to allow older homeowners to convert their home equity into liquid assets. *Cf. Bennett v. Donovan*, 703 F.3d 582, 584 (D.C. Cir. 2013). In the typical reverse-mortgage transaction, the borrower receives a loan—in either a lump sum, a series of periodic payments, or a line of credit—that is secured by a mortgage on his home. *Id.* at 584–85. Unlike a traditional mortgage loan, a reverse-mortgage loan generally needn't be repaid until a specific "triggering" event occurs—usually, the borrower's death or the sale of his home. *Id.* Upon the occurrence of that event, either (1) the estate will pay off the loan or (2) the lender will foreclose on the home to recover the money it lent.

Reverse mortgages are ordinarily "non-recourse" loans, meaning that even if a borrower or his estate fails to repay the loan when due and the sale of the home doesn't cover the outstanding balance, the lender can't go after any of the borrower's (or his estate's) other assets. *Id.* at 585. "This feature is, of course, favorable to borrowers but introduces significant risk for lenders—if regular disbursements are chosen, they can continue until the death of the borrower (like a life annuity), and the loan balance will increase over time, making it less and less

3

likely that the borrower will be able to cover the full amount." *Id.* And "[i]f a borrower lives substantially longer than expected, lenders could face a major loss." *Id.*

Recognizing both the risks to lenders and the "special needs of elderly homeowners" facing rising costs of living on reduced income, Congress authorized the HUD Secretary to administer a mortgage-insurance program designed to induce lenders to offer reverse-mortgage loans. *See generally* 12 U.S.C. § 1715z-20 ("Insurance of home equity conversion mortgages for elderly homeowners"). This program "provide[s] assurance to lenders that, if certain conditions [are] met, HUD [will] provide compensation for any outstanding balance not repaid by the borrower or covered by the sale of the home." *Bennett*, 703 F.3d at 585.

Section 1715z-20 specifies several conditions that a reverse mortgage must meet to be insurable under the program. One such condition—central to this appeal—prohibits HUD from insuring a reverse-mortgage contract that permits foreclosure while either the borrowing homeowner or his or her spouse continues to reside in the mortgaged property:

> The Secretary may not insure a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary. For purposes of this subsection, the term "homeowner" includes the spouse of a homeowner.

*Id.* § 1715z-20(j).

## II

In 2014, Caldwell Jones obtained a reverse mortgage, which the original lender almost immediately assigned to Live Well Financial, Inc.[1]  The mortgage was secured by the home that Caldwell shared with his wife Vanessa and their minor daughter, and was covered by HUD's mortgage-insurance program.  The reverse-mortgage contract (in mortgag-ese, the "security deed") expressly defined the "Borrower" to be "Caldwell Jones, Jr., a married man."  Vanessa was not designated a "Borrower"—and indeed, at the time was not yet 62 years old, which is the minimum age to qualify for a reverse mortgage.  Later that same year, Caldwell died.

Shortly thereafter, Live Well asserted a right to repayment under a provision of the mortgage contract authorizing it to "require immediate payment-in-full of all sums secured by this Security Instrument" if "[a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower."  When the loan was

---

[1] For those who may not remember, Caldwell ("Pops") Jones was, as the kids would say, a "legit baller" in his day.  The 32nd pick in the 1973 NBA Draft, Caldwell played three seasons in the ABA and then 14 more in the NBA, most prominently for the Philadelphia 76ers.  While Julius Erving ("Dr. J.") provided those 76er teams their flash, Caldwell did the yeoman's work—playing tenacious D and controlling the boards.  For his efforts, in both 1981 and 1982 Caldwell was named to the NBA All-Defensive First Team.  *See generally* Caldwell Jones, Wikipedia (Aug. 20, 2018), https://en.wikipedia.org/wiki/Caldwell_Jones.  For a few video highlights of Caldwell's career—including a nasty block of all-time NBA leading scorer Kareem Abdul-Jabbar's jumper, check out the following link: In Memoriam: Caldwell Jones, YouTube (Aug. 20, 2018), https://www.youtube.com/watch?v=PqFI8uvLew4.

not repaid, Live Well initiated non-judicial foreclosure proceedings by running a "Legal Notice of Default and Notice of Sale Under Power" in a local newspaper.

In response, Vanessa, individually and on behalf of both the Estate of Caldwell Jones and her minor daughter (collectively, "the Estate"), filed a petition in state court seeking injunctive relief to prevent the foreclosure sale.  The Estate argued that 12 U.S.C. § 1715z-20(j) prohibited Live Well from foreclosing while Vanessa lived in the home because even though she was not a "Borrower" under the terms of the mortgage contract, she was nonetheless a "homeowner" protected by the statute.  A state-court judge granted a temporary restraining order and enjoined the foreclosure.  Live Well then removed the case to federal court and filed a motion to dismiss.  The district court granted that motion, concluding that § 1715z-20(j) addresses only HUD's authority to insure loans and does not affect Live Well's contractual right to foreclose.  This appeal followed.

### III

On appeal, the Estate contends that the district court's order dismissing its action to enjoin the foreclosure must be reversed because it "is contrary to public policy and Congress's express intent to protect the non-borrowing surviving spouse of a [r]everse [m]ortgage [b]orrower from displacement from their

6

residential home." Br. of Appellant at 5, 6.[2] For the reasons that follow, we are constrained to reject the Estate's contention.

To begin, it seems clear to us that Live Well has a right to foreclose under Georgia law and the terms of the mortgage contract. "Georgia law clearly authorizes the use of 'non-judicial power of sale foreclosure' as a means of enforcing a debtor's obligation to repay a loan secured by real property." *You v. JP Morgan Chase Bank*, 743 S.E.2d 428, 430 (Ga. 2013). This process "permits private parties to sell at auction, without any court oversight, property pledged as security by a debtor who has come into default." *Id.* Aside from some limited statutory consumer protections not at issue here, "non-judicial foreclosure is governed primarily by contract law." *Id.* A security deed that includes a power-of-sale provision "is a contract and its provisions are controlling as to the rights of the parties thereto and their privies." *Gordon v. S. Cent. Farm Credit, ACA*, 446 S.E.2d 514, 515 (Ga. 1994).

Here, the mortgage contract authorized the sale of the property to recover the balance due if "[a] Borrower dies and the Property is not the principal residence of at least one surviving Borrower." Importantly, although Vanessa remained in the house following Caldwell's death, the Estate has repeatedly and consistently acknowledged—from the very outset of this litigation—that she is *not* a

---

[2] Our review is *de novo*. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).

"Borrower" under the mortgage contract. And with good reason: as already noted, the contract explicitly defines the term "Borrower" to mean "Caldwell Jones, Jr., a married man."[3] Accordingly, under the plain terms of the mortgage contract—which defers foreclosure following a "Borrower['s]" death only as long as a "surviving Borrower" still lives in the mortgaged property—Live Well clearly had authority to foreclose upon the death of sole "Borrower" Caldwell.

Not so fast, says the Estate. It contends that contract terms aside, § 1715z-20(j) protected Vanessa from displacement as a non-borrowing surviving "spouse" who remained in the home. In the Estate's view, Congress's clear "intent" in enacting § 1715z-20(j) was to require lenders to defer homeowners' loan obligations beyond the homeowner's death until his spouse either dies or sells the property. The question before us, therefore, is whether, as the Estate asserts, federal law effectively supersedes the mortgage contract's contrary terms.

---

[3] In its petition for injunctive relief, the Estate acknowledged that "[a]t the time of the execution of the [r]everse [m]ortgage, the only borrower of the reverse[] mortgage was Caldwell." Lest there be any uncertainty, the petition reiterated that "there is absolutely no doubt that Plaintiff Vanessa Jones is the non-borrowing surviving spouse [and] that she did not qualify for the age requirement (62) to even apply for a reverse mortgage." The Estate also attached to the petition an affidavit in which Vanessa described her "status" as "a non-debtor spouse." Indeed, even the Estate's brief to this Court repeatedly refers to Vanessa as a "non-borrowing spouse." Br. of Appellant at 1, 3, 5, 6, 9.

In a surprising turnabout, the Estate asserted for the first time at oral argument that, in fact, Vanessa *could* be deemed a "Borrower" entitled to protection under the mortgage contract. Even assuming that the Estate's new argument doesn't fall victim to a waiver analysis, we reject it. Not only does the very first page of the mortgage contract define the term "Borrower" to mean Caldwell, but the Estate's new contention is contradicted by its repeated and consistent concessions (1) that Caldwell was "the only borrower," (2) that Vanessa was a "non-borrowing spouse," and, indeed, (3) that Vanessa wasn't even old enough to qualify for a reverse mortgage.

As an initial matter, we agree with the Estate that § 1715z-20(j) reflects Congress's "intent" to safeguard widowed spouses like Vanessa. Subsection (j) not only protects "homeowner[s]" from displacement but also expressly defines the term "homeowner" to include "the spouse of the homeowner." 12 U.S.C. § 1715z-20(j). Indeed, we can assume (without deciding) that HUD shouldn't have insured the mortgage contract at issue here because it failed to protect the widowed non-borrower from displacement following the death of her borrower spouse.

Even so, we cannot grant the Estate the relief it seeks. While Congress might well have "inten[ded]" for non-borrower surviving spouses to enjoy protection under HUD-insured mortgages, § 1715z-20(j)'s plain language applies only to HUD and speaks only to what the Secretary can and cannot do: "*The Secretary may not insure* a home equity conversion mortgage under this section unless such mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or the occurrence of other events specified in regulations of the Secretary." 12 U.S.C. § 1715z-20(j) (emphasis added). Without respect to whether it was properly insured under § 1715z-20(j), the mortgage contract here created and embodies an independent legal relationship between Live Well and Caldwell. Section 1715z-20(j) says nothing about private contractual obligations one way or the other, and

9

thus cannot be read to alter or affect the enforceability of the mortgage contract or its terms.

No matter how compelling we may find the Estate's arguments as a matter of public policy, we must apply the "plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). So even assuming that HUD insured Caldwell's mortgage in violation of § 1715z-20(j), Live Well still had a private *contractual* right—independent of the statute—to demand immediate payment and, if necessary, pursue foreclosure.

## IV

For the foregoing reasons, we hold that the district court properly granted Live Well's motion to dismiss. Even if (as we have assumed) HUD shouldn't have insured Caldwell's mortgage, 12 U.S.C. § 1715z-20(j) does not alter or limit Live Well's right to foreclose under the terms of its valid mortgage contract.[4]

---

[4] In so holding, we are in good company. *See, e.g.*, *Jeansonne v. Generation Mortg. Co.*, 644 F. App'x 355, 357 (5th Cir. 2016) ("[W]hile HUD may have violated § 1715z-20(j) by insuring a reverse mortgage that failed to protect … the non-borrowing spouse … this would not affect [the lender's] right to foreclose under the terms of the contract it executed with [the borrower]."); *In re D'Alessio*, 2018 WL 2972340, at *5 (Bankr. D. Mass. June 11, 2018) ("While § 1715z-20(j) speaks to the circumstances under which HUD should properly insure a reverse mortgage, nothing in the statute speaks to when a lender is allowed to foreclose.") (internal quotations omitted); *Pikaart v. Fin. Freedom*, 2017 WL 5624747, at *4 (W.D. Mich. Oct. 31, 2017) (lender was entitled to foreclose against non-borrowing spouse under the terms of the mortgage contract, and § 1715z-20(j) did not affect that right); *Fed. Nat'l Mortg. Ass'n v. Takas*, 2017 WL 3016785, at *5 (D. Utah July 14, 2017) ("By its terms, Section 1715z-20(j) does not apply to lenders and does not affect the validity or enforceability of the terms of contracts between lenders and borrowers."); *Harris v. Castro*, 2015 WL 13547618, at *3 (N.D. Ga. Nov. 19, 2015) (denying request for TRO because the lender "ha[d] a separate security deed which is not contingent upon the validity or [e]ffect of" § 1715z-20(j) or its implementing regulations); *Bombet v. Donovan*,

10

**AFFIRMED.**

---

2015 WL 1276555, at *5 (M.D. La. Mar. 19, 2015) "[W]hile HUD may have violated 12 U.S.C. § 1715z-20(j) when it insured [the] reverse mortgage, this did not render the mortgage contract … legally unenforceable or invalid."); *Aldi v. Wells Fargo Bank, N.A.*, 2015 WL 3650297, at *7 (D. Conn. Feb. 17, 2015) ("[T]he Court agrees with defendants that 12 U.S.C. § 1715z-20(j) governs HUD's insurance of reverse mortgages, not the independent contractual relationship between mortgagors and mortgagees."); *Kizler v. Liberty Reverse Mortg.*, 2014 WL 12561056, at *7 (C.D. Cal. May 5, 2014) ("Despite Plaintiff's arguments to the contrary, 12 U.S.C. § 1715z-20(j) does not strip lenders of the right to foreclose.").