[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11098

_____

D.C. Docket No. 2:17-cv-14222-RLR

MICHELINA IAFFALDANO,

Plaintiff-Appellant,

versus

SUN WEST MORTGAGE COMPANY, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 9, 2019)

Before MARCUS, GRANT and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Michelina Iaffaldano, a Florida homeowner, brought this suit

against defendant Sun West Mortgage Company Inc. ("Sun West"), the servicer of

a reverse mortgage that Iaffaldano obtained on her home.  In her complaint, Iaffaldano alleged, among other things, that Sun West violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and its implementing regulation, Regulation X, 12 C.F.R. § 1024, when it charged her for force-placed hazard insurance instead of advancing monies to her insurance carrier through an escrow account.

Following a two-day bench trial, the district court entered judgment in favor of Sun West.  After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

### A.    Reverse Mortgage

Iaffaldano resides in a home in St. Lucie County, Florida, which is subject to a home-equity conversion mortgage, commonly called a "reverse mortgage," that she took out in 2009.  A reverse mortgage is a financial instrument designed to allow older homeowners to convert their home equity into liquid assets.  Estate of Jones v. Live Well Fin., Inc., 902 F.3d 1337, 1338-39 (11th Cir. 2018).  As in a typical reverse-mortgage transaction, Iaffaldano received a loan that is secured by a mortgage on her home.  See id.  The loan was for $255,000.  Iaffaldano was not obligated to repay the loan until a later "triggering" event, such as if she sold the

2

home.  See id.  Indeed, Iaffaldano was not required to make monthly payments to Sun West.

Under the mortgage's terms, Iaffaldano was required to maintain hazard insurance ("insurance") on her property and pay all necessary insurance premiums and taxes.  When obtaining the mortgage, Iaffaldano signed a written form electing to make those insurance and tax payments herself.  Iaffaldano did not establish an escrow account, or otherwise set aside funds, with Sun West to pay for her insurance and taxes.  At trial, a representative of Sun West confirmed that Iaffaldano did not have an escrow account with it or any other monetary set-aside for insurance and taxes.

Iaffaldano initially purchased the necessary insurance coverage, but the policy lapsed in 2010 when she did not pay the premiums.  Despite numerous notifications sent by Sun West, she still failed to renew the insurance.

## B.    2013 Repayment Plan Agreement

Eventually and upon the request of Iaffaldano, Sun West advanced her a total of $5,407 so that she could obtain insurance for her property in 2012 and 2013.  Sun West paid the premiums directly to the insurance carrier, the People's Trust Insurance Company, and Iaffaldano's property was properly insured from August 2012 through August 2014.  During this time period, Sun West also

advanced Iaffaldano $644 in funds to pay her taxes, increasing the amount to $6,051 that she owed Sun West.

In 2013, Iaffaldano and Sun West entered into a Repayment Plan Agreement ("Agreement"), wherein Iaffaldano agreed to repay Sun West the $6,051 in advanced funds in 12 monthly installments of $504.25. Under the Agreement, Sun West did not set aside any additional money for future insurance premiums and taxes. Rather, the Agreement concerned only Iaffaldano's repayment of the money Sun West already had advanced to pay her insurance and taxes in 2012 and 2013. The Agreement made clear that Iaffaldano's failure to make the scheduled payments could result in a default of the reverse mortgage.

Iaffaldano, however, did not make any payments at all to Sun West under the Agreement and therefore defaulted on both that Agreement and the reverse mortgage. According to Sun West, this signaled that Iaffaldano neither intended to obtain insurance for her property on her own, nor intended to reimburse Sun West for the $6,051 it had advanced for her insurance and taxes in 2012 and 2013.

## C.    Force-Placed Insurance

On December 31, 2013, Sun West instituted a foreclosure action in Florida state court due to Iaffaldano's failure to pay the required insurance premiums and taxes under the reverse mortgage. Thereafter, in August 2014, Iaffaldano's insurance coverage lapsed again. As a result, Sun West sent two letters

encouraging Iaffaldano to purchase insurance and explaining that if she did not do so, Sun West would be required to force-place the insurance, which is typically more expensive.  Iaffaldano still did not obtain insurance for her property.

In September 2014, because of this lapse, Sun West obtained a force-placed insurance policy for Iaffaldano's property through Proctor Financial, Inc. ("Proctor"), with whom it has an exclusive business relationship to purchase that type of insurance.[1]  Because the Department of Housing and Urban Development requires continual insurance coverage on reverse mortgages, Sun West's force-placed policy was effective retroactively to eliminate a gap in coverage in 2012.  Sun West obtained force-placed insurance again for Iaffaldano in 2015.  In total, Sun West paid $11,736.30 for the force-placed insurance policy, that is $4,942.77 for each year in 2014 and 2015, and $1,850.76 for the 2012 coverage.

## D.    Past Due Balance Brought Current

In July 2016, the past due balance Iaffaldano owed to Sun West was brought current through funds provided by the Florida Hardest-Hit Fund Elderly Mortgage Assistance Program ("ELMORE"), a state-run forgivable loan program.  The state agency gave $36,689.68 to Sun West, of which $30,758.05 was used to pay off

---

[1]"Force-placed insurance," as defined by RESPA, is "hazard insurance coverage obtained by a servicer of a federally related mortgage when the borrower has failed to maintain or renew hazard insurance on such property as required of the borrower under the terms of the mortgage." 12 U.S.C. § 2605(k)(2).

5

Iaffaldano's past due balance, representing the accumulated insurance premiums and taxes owed on Iaffaldano's reverse mortgage. After paying the balance Iaffaldano owed, there was extra money left over, $5,931.63, that Sun West in 2016 placed in a trust account. This 2016 trust account was later used to pay for property insurance that came due in the future. Once Iaffaldano's balance was current, Sun West dismissed the foreclosure action.

Ultimately, Iaffaldano personally did not make any payments to Sun West to cover the cost of the force-placed insurance that it purchased for her home in 2014 or 2015. Nor did she personally repay Sun West for the funds it advanced her to cover her insurance premiums and taxes in 2012 and 2013.

## II.  PROCEDURAL HISTORY

In her amended complaint, Iaffaldano alleged in relevant part that Sun West and Proctor violated RESPA, 12 U.S.C. § 2605(m), with the force-placed insurance transactions in 2014 and 2015 because the charges were not bona fide and reasonable. Iaffaldano also alleged that Proctor engaged in an unlawful business relationship with Sun West. The district court entered judgment for Proctor on both claims. Iaffaldano does not seek review of the district court's disposition of her claims against Proctor. Thus, Sun West is the only defendant on appeal.

In the parties' joint pretrial statement, Iaffaldano alleged further that Sun West violated Regulation X, specifically 12 C.F.R. § 1024.17, when it purchased the force-placed insurance in 2014 and 2015 because her 2013 Repayment Plan Agreement established an escrow account.  Iaffaldano argued that, under 12 C.F.R. § 1024.17(k)(5), Sun West was prohibited from force-placing insurance on her property in 2014 and 2015 and, instead, had an affirmative obligation to advance her additional funds through an escrow account so that she could purchase and maintain her voluntary insurance coverage through the People's Trust Insurance Company.  Iaffaldano alleged that she was damaged as a result because the force-placed insurance in 2014 and 2015 was unnecessary and more expensive.

After the bench trial, the district court determined, inter alia, that Iaffaldano's force-placed insurance claims lacked merit.  As to her allegation that Sun West violated 12 C.F.R. § 1024.17(k)(5) by force-placing the insurance instead of advancing her additional funds for her insurance premiums, the district court concluded that RESPA does not create a private right of action for allegations that a mortgage servicer violated § 1024.17(k)(5).  In addition, the district court found that § 1024.17(k)(5) does not apply in any event because Iaffaldano had not proven that she had an escrow account with Sun West in 2014 and 2015 or that the 2013 Repayment Plan Agreement established such an escrow account.

Accordingly, the district court entered judgment in favor of Sun West on her claims.  This appeal followed.[2]

### III.  DISCUSSION

On appeal, Iaffaldano argues that the district court erred in finding that no private right of action existed for her claims that Sun West violated § 1024.17(k)(5) when it purchased the force-placed insurance.  She contends that § 1024.17(k)(5) was promulgated under § 6 of RESPA, specifically 12 U.S.C. § 2605(k).  Because § 2605(f) provides an express private right of action for violations of § 6 of RESPA, Iaffaldano asserts that a private right of action exists for her claims that Sun West violated § 1024.17(k)(5).  Alternatively, Iaffaldano argues that her claims are cognizable under the Qualified Written Request provision of RESPA found at 12 U.S.C. § 2605(e).[3]

We need not decide whether a private right of action exists under RESPA for Iaffaldano's force-placed insurance claims.  Even assuming <u>arguendo</u> that a private right of action exists, the district court did not clearly err in finding that Iaffaldano

---

[2]After a bench trial, we review the district court's conclusions of law <u>de novo</u> and the district court's findings of fact for clear error.  <u>Garcia-Celestino v. Ruiz Harvesting, Inc.</u>, 843 F.3d 1276, 1284 n.4 (11th Cir. 2016).  We review the district court's interpretation of federal statutes and regulations <u>de novo</u>.  <u>Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs.</u>, 701 F.3d 356, 361 (11th Cir. 2012); <u>Stansell v. Revolutionary Armed Forces of Colombia</u>, 771 F.3d 713, 733 (11th Cir. 2014).

[3]Because this claim was first raised on appeal, we will not consider it.  <u>See</u> <u>Access Now, Inc. v. Sw. Airlines Co.</u>, 385 F.3d 1324, 1331 (11th Cir. 2004).

did not have an escrow account with Sun West in 2014 and 2015 to trigger any obligation under § 1024.17(k)(5) in the first place.

## A.    RESPA and Force-Placed Hazard Insurance

RESPA is a consumer protection statute that regulates the real estate settlement process.  Hardy v. Regions Mortg., Inc., 449 F.3d 1357, 1359 (11th Cir. 2006).  RESPA requires mortgage servicers to comply with the obligations specified in § 6, including provisions concerning the administration of escrow accounts, as well as any regulations issued to carry out the statute's purposes.  See 12 U.S.C. §§ 2605(a)-(m).

In 2010, Congress added new obligations to § 6 of RESPA with respect to force-placed hazard insurance coverage.  See Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub L. No. 111-203, 124 Stat. 1376 (2010), at § 1463 (2010).  In particular, a mortgage servicer is prohibited from "obtain[ing] force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance."  12 U.S.C. § 2605(k)(1)(A).  In order to have such a reasonable basis, the servicer must meet the statutory requirements of 12 U.S.C. § 2605(l) and its implementing rules.  Id.; 12 U.S.C. § 2065(k)(1)(E).

9

In 2013, the Consumer Financial Protection Bureau promulgated new rules in Regulation X to implement the Dodd-Frank Act's force-placed hazard insurance protections. See Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act, 78 Fed. Reg. 10696, 10696 (Feb. 14, 2013). As relevant here, Regulation X now provides borrowers with additional protections against force-placed hazard insurance if they have an escrow account established with their mortgage servicer. Specifically, § 1024.17(k)(5) provides that, if a borrower has an established escrow account, a servicer is obligated to disburse funds from that escrow account to pay for the borrower's hazard insurance premiums and may not obtain force-placed insurance unless the servicer has a reasonable basis to believe the borrower's hazard insurance has been canceled or not renewed for reasons other than nonpayment of premium charges. 12 C.F.R. § 1024.17(k)(5)(i)-(ii).

## B.    No Escrow Account

As the district court correctly concluded, Iaffaldano's force-placed insurance claims hinge on whether or not she had an escrow account with Sun West in 2014 and 2015 to trigger the protections under § 1024.17(k)(5). Iaffaldano contends that she did have an escrow account by virtue of the 2013 Repayment Plan Agreement. We disagree.

We start with the definition of an "escrow account" in Regulation X. For purposes of 12 C.F.R. § 1024.17, an escrow account means:

10

any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay. The definition encompasses any account established for this purpose, including a "trust account", "reserve account", "impound account", or other term in different localities. An "escrow account" includes any arrangement where the servicer adds a portion of the borrower's payments to principal and subsequently deducts from principal the disbursements for escrow account items. For purposes of this section, the term "escrow account" excludes any account that is under the borrower's total control.

12 C.F.R. § 1024.17(b).

Here, the record evidence shows that, at the time Iaffaldano obtained the reverse mortgage, she elected not to have Sun West set up an escrow account for the payment of her insurance premiums and taxes. Instead, Iaffaldano agreed to make those payments herself. There is no evidence that this election ever changed. Indeed, at trial, the Sun West representative confirmed that Iaffaldano did not have an escrow account with Sun West or any other monetary set-aside for insurance coverage and taxes in 2014 and 2015.

Although a trust account was established for Iaffaldano in June 2016 when Sun West received the ELMORE funds, that account was created well after Sun West obtained the force-placed insurance in 2014 and 2015. Therefore, the 2016 trust account did not, and could not, trigger any § 1024.17(k)(5) obligation in 2014 and 2015.

11

Despite Iaffaldano's argument to the contrary, the 2013 Repayment Plan Agreement did not establish an escrow account with Sun West. Nothing in the Agreement itself set aside funds for Sun West to pay Iaffaldano's insurance premiums or taxes when they came due in the future. Rather, the Agreement required Iaffaldano to reimburse Sun West for money it already had paid for her insurance and taxes in 2012 and 2013. And when Sun West advanced those funds in 2012 and 2013, it paid the insurance company directly out of its own funds, not through an escrow account set up for Iaffaldano.

In trying to transform the Agreement into something it was not, Iaffaldano argues that Sun West: (1) added the amount of money it advanced for her insurance premiums and taxes to the principal balance on her reverse mortgage; (2) instituted a foreclosure proceeding when she did not make her reimbursement payments under the Agreement, providing further evidence that the amount advanced was now considered part of the principal on her reverse mortgage; and then (3) used the ELMORE funds to pay for the owed insurance premiums and taxes. According to Iaffaldano, those facts bring the 2013 Repayment Plan Agreement within § 1024.17's definition of an escrow account because it is an "arrangement where the servicer adds a portion of the borrower's payment to principal and subsequently deducts from principal the disbursements for escrow account items." We find this argument unavailing.

12

Reimbursing Sun West for the insurance premiums and taxes that it already had paid on Iaffaldano's behalf in 2012 and 2013 is not an escrow account arrangement. And that Sun West was required to secure that repayment through a foreclosure action does not somehow transform the reimbursement payment into an escrow account arrangement either. Finally, because Iaffaldano never made a single principal payment to Sun West on her reverse mortgage, she has not shown that Sun West added any such payment to the principal she owed and then used that money to pay for escrow items.

And Iaffaldano's characterization of the 2013 Repayment Plan Agreement has a fatal flaw: it is entirely inconsistent with the Security Instrument she signed in 2009 to obtain the reverse mortgage. Sun West's authority to advance money for insurance premiums came from Paragraph 5 of the Security Instrument, which further stated that "[a]ny amounts disbursed by [Sun West] under this Paragraph shall become an additional debt of [Iaffaldano] . . . secured by this Security Instrument." The Security Instrument then made clear that any such "additional debt" incurred under Paragraph 5 was wholly separate from the principal of the reverse mortgage: "This Security Instrument secures to [Sun West]: (a) . . . a maximum principal amount of Two Hundred Fifty Five Thousand Dollars and Zero Cents . . . ; (b) the payment of all other sums, with interest, advanced under

13

paragraph 5 . . . ; and (c) the performance of Borrower's covenants and agreements." (emphasis added).

Thus, Iaffaldano is incorrect when she argues that "Sun West could not have initiated foreclosure proceedings against [her] in connection with the debt arising from the Repayment Plan Agreement, without increasing the principal on the reverse mortgage to include the amounts attributable to those expenses." Sun West was able to foreclose because Iaffaldano's debt under the Repayment Plan Agreement was independently secured by the Security Instrument under (b) and Paragraph 5—not because that debt was added to principal under (a). And because the ELMORE funds were never added to principal, Sun West did not "deduct" anything from principal when it disbursed those funds. Despite Iaffaldano's best efforts to fit a square peg into a round hole, the Repayment Plan Agreement was not an escrow arrangement as defined in § 1024.17.

For these reasons, we conclude that the district court did not err in determining that Iaffaldano did not prove that she had an escrow account with Sun West in 2014 and 2015. We affirm the district court's final judgment in favor of Sun West.

**AFFIRMED.**

14