# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 8, 2021                    Decided June 22, 2021

No. 20-5100

FOOD & WATER WATCH,
APPELLANT

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01714)

*Tarah Heinzen* argued the cause and filed the briefs for appellant.

*Michael B. Buschbacher*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jonathan D. Brightbill*, Principal Deputy Assistant Attorney General, *Eric A. Grant*, Deputy Assistant Attorney General, *Krystal-Rose Perez*, Attorney, and *Stephen Alexander Vaden*, General Counsel, U.S. Department of Agriculture.

Before: GARLAND∗ and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Concurring opinion filed by *Senior Circuit Judge* RANDOLPH.

RAO, *Circuit Judge*: The Department of Agriculture's Farm Service Agency guaranteed a loan for a chicken farm in 2015. Two years later, Food & Water Watch brought suit against the Agency alleging that the environmental assessment made in connection with the loan guarantee was contrary to the requirements of the National Environmental Policy Act and therefore the assessment should be vacated and the loan guarantee enjoined. The district court granted summary judgment to the Agency, concluding Food & Water Watch had demonstrated standing, but the Agency reasonably determined no environmental impact statement was necessary.

We hold that Food & Water Watch lacks standing because it has failed to establish that its claims are redressable by a favorable action of this court. We thus vacate and remand with instructions to dismiss the case for lack of jurisdiction.

I.

In order to purchase and construct One More Haul Farm (the "farm"), a prospective farmer sought several loans from MidAtlantic Farm Credit (the "lender"). The poultry farm would be built in Caroline County, Maryland, on a parcel of land located near Watts Creek and in the watershed for the Upper Choptank River, which discharges into the Chesapeake

---

∗ Then-Judge Garland was a member of the panel but did not participate at oral argument or in the disposition of this case.

Bay. To secure a loan for the farm's poultry houses, the lender applied for a loan guarantee from the Farm Service Agency ("FSA" or "Agency").

Pursuant to the Guaranteed Farm Loan Program, the FSA may guarantee loans made to a farmer for specified purposes, including, as relevant here, farm ownership. *See* 7 C.F.R. § 762.121(b)(1)–(5) (2020). To be eligible for a loan guarantee, a prospective borrower must certify that he is "unable to obtain sufficient credit elsewhere without a guarantee to finance actual needs at reasonable rates and terms." *Id.* § 762.120(h)(1). Although the FSA guarantees a part of the loan, the lender retains primary responsibility for "[e]nsuring the borrower is in compliance with all laws and regulations applicable to the loan, the collateral, and the operations of the farm." *Id.* § 762.140(b)(3).

In 2015, when the lender sought the loan guarantee on the farmer's behalf, regulations interpreting the National Environmental Policy Act ("NEPA") required the FSA to conduct an environmental assessment to consider the effects of the farm before granting the guarantee. *See* 7 C.F.R. § 1940.312(c)(9), (10) (2015);[1] *see also* National

---

[1] When the FSA guaranteed this loan in 2015, the FSA's regulations "presumed" that these types of loan guarantees were "major Federal actions" subject to NEPA requirements. 7 C.F.R. § 1940.312 (2015); *see also id.* § 1940.312(c)(9), (10). The Council on Environmental Quality, however, issued revised NEPA regulations, effective in September 2020, that explicitly exclude FSA loan guarantees from that definition. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,348–49 (July 16, 2020) (codified at 40 C.F.R. pt. 1508). Because we conclude that Food & Water Watch lacks standing, we do not reach the question of whether the revised NEPA regulations render this action moot.

Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (codified at 42 U.S.C. §§ 4321 *et seq.*). As a threshold matter, the FSA had to determine whether the farm would "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). To make this determination, the Agency consulted with local, state, and federal agencies about the farm's environmental effects. It published two drafts of the farm's environmental assessment for public comment in April and May 2015, and before publishing the final environmental assessment it also considered the recommendations of a private environmental consulting firm hired to review the second draft's analysis. Based on its environmental assessment, the FSA issued a "finding of no significant impact" rather than a more detailed environmental impact statement. *See* 7 C.F.R. § 1940.318(k) (2015); *see also* 42 U.S.C. § 4332(2)(C). The issuance of this finding relieved the Agency from any further NEPA obligations. *See* 7 C.F.R. § 1940.318(k) (2015). Accordingly, the Agency provided the loan guarantee in July 2015, covering ninety percent of the $1,217,000 loan. The farm has been up and running since Fall 2016 and consists of four chicken houses, a manure structure, and a composting area. It "houses 192,000 birds at one time," with "an average of 5.6 flocks per year, producing more than 1,000,000 birds and their waste each year." Compl. ¶ 46.

Two years after the loan was approved, Food & Water Watch, a non-profit environmental group, filed a complaint against the Department of Agriculture, the FSA, and Deanna Dunning in her official capacity as an FSA farm loan officer. Food & Water Watch alleged that the Agency's failure to prepare an environmental impact statement for the farm violated NEPA and the Administrative Procedure Act ("APA"). This failure purportedly injured the thousands of Food & Water Watch members who lived in Maryland, including one who lived next door to the farm and was

subjected to loud noises, bright lights, foul odors, and flies resulting from the farm's operation. The farm's impacts, Food & Water Watch alleged, caused this member to have health concerns and to experience decreased enjoyment of her home. Another member of Food & Water Watch who fishes in the waters near the farm asserted that he was concerned about pollution caused by the farm, as well as negative aesthetic and recreational impacts in his fishing areas.

The Agency moved for judgment on the pleadings, contending that Food & Water Watch lacked standing. The district court held that Food & Water Watch had standing. The court first found that the asserted harms established an injury in fact because they concretely "affect[ed] the recreational and aesthetic interests of the plaintiff's members." *Food & Water Watch v. U.S. Dep't of Agric.*, 325 F. Supp. 3d 39, 54 (D.D.C. 2018). As for causation, the court found that the record established a loan for the farm would have been unlikely without the guarantee, "and no loan would mean no [farm]." *Id.* at 54–55. Finally, Food & Water Watch's claims were redressable because vacatur of the "guarantee would put a substantial portion of the [farm's] funding at risk," and the farmer would likely comply with additional environmental conditions imposed on the guarantee to continue to receive its benefit. *Id.* at 55–56.

Both parties moved for summary judgment. The district court rejected the Agency's renewed objection to Food & Water Watch's standing and then granted summary judgment to the Agency, holding that the environmental assessment satisfied the requirements of NEPA. *See Food & Water Watch v. U.S. Dep't of Agric.*, 451 F. Supp. 3d 11, 28, 54–55 (D.D.C. 2020). Food & Water Watch timely appealed.

II.

This case begins and ends with standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). We review whether Food & Water Watch has standing de novo. *See Affum v. United States*, 566 F.3d 1150, 1158 (D.C. Cir. 2009).

Food & Water Watch asserts that it has associational standing on behalf of its members. To establish such standing, Food & Water Watch bears the burden of demonstrating "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 246–47 (D.C. Cir. 2013) (cleaned up). At the summary judgment stage, Food & Water Watch "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (cleaned up). Food & Water Watch fails at the first step of the associational standing inquiry. Even assuming Food & Water Watch could establish a member's injury and could connect that injury to the loan guarantee, it has failed to establish redressability and therefore lacks associational standing.

Food & Water Watch attempts to demonstrate redressability as follows. If the loan guarantee were vacated, the lender and farmer would again seek a loan guarantee from the Agency, because such a guarantee was necessary for the original loan. The Agency would then undertake a new NEPA analysis and could impose environmental measures on the farm as a condition of reinstating the guarantee. Food & Water Watch asserts that the farmer and the lender would have

"strong financial incentives" to agree to any additional environmental measures because they would need a new loan guarantee. Appellant's Reply Br. 3.

Although this case involves a procedural injury, namely the Agency's failure to prepare an environmental impact statement, redressability turns not only on the actions of the Agency, but the independent actions of the farmer and lender in seeking a new loan guarantee. Food & Water Watch challenges the Agency's loan guarantee; however, its members' asserted injuries spring not from the guarantee but from what the guarantee helped accomplish—the farm's construction and operation. To find redressability, we must therefore determine whether vacating the Agency's loan guarantee would, as a practical matter, significantly increase the likelihood that Food & Water Watch's members would be relieved of their asserted environmental harms. *See Village of Bensenville v. FAA*, 457 F.3d 52, 69–70 (D.C. Cir. 2006). In other words, we must decide whether vacating the guarantee is likely to change how the farm operates. The redressability inquiry therefore "hinge[s] on the independent choices of" third parties not before this court—the lender and the farmer. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (cleaned up). Accordingly, we apply the ordinary standards of redressability.[2]

---

[2] Food & Water Watch maintains that a relaxed standard of redressability should apply here because the case concerns a procedural injury. This is true insofar as Food & Water Watch is not required to "'establish with any certainty' that the *agency* would reach a different decision" if we vacated the loan guarantee. *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008) (quoting *Lujan*, 504 U.S. at 572 n.7). The relaxation of redressability standards for procedural injuries, however, applies only to the Agency's actions, not to third parties not before the court.

Considering the facts as they existed in 2017, we hold that Food & Water Watch has failed to establish that it is "*likely*, as opposed to merely speculative," that vacatur of the loan guarantee would redress its members' alleged injuries. *Lujan*, 504 U.S. at 561 (emphasis added) (cleaned up). The real question of redressability here is not whether the Agency could or would impose new environmental measures as a condition of the loan guarantee. Rather, it is whether the lender or the farmer would even seek to have the loan guaranteed if the original guarantee were set aside. Food & Water Watch speculates the farmer would likely agree to additional environmental measures as a condition of a new loan guarantee. Yet that puts the cart before the horse.

Food & Water Watch bears the burden of demonstrating standing but has provided no evidence that the lender or the farmer would apply for a new loan guarantee. That is, Food & Water Watch has established neither that the lender would foreclose on the loan in the absence of the guarantee, nor that the farmer would be unable to secure sufficient credit elsewhere without the guarantee. In 2015, the lender was willing to issue the $1.2 million dollar loan only with the FSA's guarantee, because at the time the farmer did not meet its lending standards. Standing, however, must be "assessed as of

*See id.* Food & Water Watch argues that the third parties here are not truly independent "actors making 'unfettered choices'" because the farmer and the lender "are bound with [the Agency] through the guarantee." Appellant's Reply Br. 8 (quoting *Lujan*, 504 U.S. at 562) (emphasis omitted). Yet Food & Water Watch simultaneously recognizes that vacatur of the loan guarantee would "restart the environmental assessment and loan guarantee process." *Id.* at 11. Thus, the farmer and the lender are independent actors "*with respect to the action at issue in [this] particular case*"—whether to seek a new loan guarantee upon vacatur. *Bennett v. Donovan*, 703 F.3d 582, 588 (D.C. Cir. 2013) (emphasis in original).

the time a suit commences," and so we consider the circumstances as they existed in 2017, when Food & Water Watch filed suit, not as they existed in 2015, when FSA guaranteed the loan. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).[3]

The record here is devoid of evidence regarding the farmer's 2017 creditworthiness or financial situation, and we can only guess how the lender or the farmer would react to a vacatur of the loan guarantee. Moreover, what evidence we have at least suggests that the farmer's financial situation was potentially different in 2017, because she had been running a fully operational poultry farm for almost one year. The farmer had contracts for her chickens and had improved the farm with four poultry houses and a manure shed. The record indicates she had the ability to access other agricultural revenue streams, such as sales of manure. She also had a payment history of more than two years against the loan, with no suggestion of default. Nothing in the record permits us to conclude that the

---

[3] The Agency frames the jurisdictional defect in light of the farmer's financial situation at the time of the appeal. Such an argument "is more aptly framed in terms of mootness, which focuses on whether events subsequent to the filing of the complaint have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) (cleaned up). Both mootness and standing pertain to whether there is a proper case or controversy before the court. *See* U.S. CONST. art III, § 2; *see also Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (describing mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (cleaned up). Our analysis focuses on standing because we conclude Food & Water Watch failed to establish jurisdiction at the outset of the litigation.

lender, who required a loan guarantee in 2015, would have made the same assessment in 2017.

Instead of providing evidence of how the lender or the farmer would react to the vacatur at the time of filing, Food & Water Watch merely emphasizes that without the loan guarantee, there would have been no farm. Yet that consideration goes to causation, because it speaks to whether Food & Water Watch's alleged injury was caused by the alleged procedural failure of the Agency. While causation and redressability are sometimes linked, "[c]ausation remains inherently historical; redressability quintessentially predictive." *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994). As we have explained, "[t]here might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). That is, a government action may have caused a harm that a favorable judicial decision cannot redress due to a change in circumstances. In this case, the Agency's loan guarantee might have been a "substantial contributing factor" to the farm's initial construction and operation, but a new status quo arguably existed when Food & Water Watch filed suit. *Id.* The change in the farm's financial situation means that causation cannot determine redressability.

Finally, the lack of any evidence about what the lender or the farmer would do if the court vacated the loan guarantee distinguishes this case from *Bennett v. Donovan*, in which there was "no serious doubt as to how the lenders would respond" to an agency's action. 703 F.3d 582, 589 (D.C. Cir. 2013). *Bennett* has no application to this case where there is an apparently stable business relationship between the lender and

the farmer, and therefore serious doubt whether they would seek a new loan guarantee upon vacatur of their original one. When significant uncertainty persists about whether judicial resolution will redress an alleged harm, we cannot string together assumptions to justify our jurisdiction.

Food & Water Watch has failed to demonstrate redressability. Absent specific evidence in the record, we decline to assume that the same financial pressures that motivated the farmer and the lender to seek the loan guarantee in 2015 would motivate an application for a new loan guarantee, which might then trigger further environmental requirements. Mere conjecture that a third party's conduct "will be altered or affected by the agency activity they seek to overturn" will not suffice. *St. John's United Church of Christ*, 520 F.3d at 463 (cleaned up). Food & Water Watch has assumed what it must demonstrate and therefore has failed to connect the vacatur of the Agency's loan guarantee with any likely change to the farm's operation.

\* \* \*

Because Food & Water Watch has not established standing, we vacate the district court's decision and remand with instructions to dismiss the case for lack of jurisdiction.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring,

Although I entirely agree with the court's opinion, I write to flag an issue lurking in this appeal, an issue the parties neglected to address and one that may recur.

Then-Judge Kavanaugh stated for our court: "whether an executive or independent agency has statutory authority from Congress to issue a particular regulation" is a separation of powers question "that arises again and again in this Court[.]" *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 453 (D.C. Cir. 2017). The related problem presented in this case was not whether a particular "administrative agency" had Congressional authority to issue some "particular regulation." The problem instead was whether the Council on Environmental Quality — CEQ — had Congressional authority to issue any regulations.

Our case revolved around CEQ's "new regulations."

CEQ is not an independent agency. It is part of the Executive Office of the President, created for the purpose of advising the President on environmental matters. *See* 42 U.S.C. §§ 4342, 4344(1). No statute grants CEQ the authority to issue binding regulations. *See City of Alexandria v. Slater*, 198 F.3d 862, 866 n.3 (D.C. Cir. 1999); *see generally* Scott C. Whitney, *The Role of the President's Council on Environmental Quality in the 1990's and Beyond*, 6 J. Env't L. & Litig. 81 (1991). Instead, CEQ's recent "regulations," 85 Fed. Reg. 43,304, 43,307 (July 16, 2020), identify its authority to issue regulations as Executive Order No. 11,991, 42 Fed. Reg. 26,967 (May 24, 1977).[1]

---

[1] Executive Order No. 11,991 amended Executive Order No. 11,514, 35 Fed. Reg. 4,247 (Mar. 5, 1970), to direct CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of the [National Environmental Policy] Act."

As a supposed federal "agency" issuing regulations binding on other federal agencies, it is rather unique.  Unique because in judicial review cases it appears only on the sidelines.  While the Supreme Court has accorded some of CEQ's regulations "substantial deference," *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979), it has never addressed the question of CEQ's regulatory authority.[2]  In this court we have questioned whether CEQ could issue binding regulations.  *Nevada v. Dep't of Energy*, 457 F.3d 78, 87 n.5 (D.C. Cir. 2006); *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006); *Slater*, 198 F.3d at 866 n.3.  Perhaps CEQ's regulations represent a  directive from the President to his subordinates.  But that is a far cry from saying, as the regulations do, that CEQ could supplant properly issued regulations of other agencies.  *See* 40 C.F.R. § 1507.3(a) ("Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply . . ..").

If CEQ's regulations are binding, several concerns would need to be addressed.  What, if any, mechanism is there for judicial review of CEQ's regulations?  Do CEQ's regulations bind executive and independent agencies alike?   Can the President override the requirement (and safeguard) of notice-and-comment rulemaking?   And can other executive offices assert this authority as well?

"[W]here there is so much smoke, there must be a fair amount of fire, and we would do well to analyze the causes[.]" Henry J. Friendly, *A Look at the Federal Administrative Agencies*, 60 Colum. L. Rev. 429, 432 (1960).  Nevertheless,

---

[2] The Solicitor General informed the Court in *Kleppe v. Sierra Club* that CEQ's "guidelines do not bind agencies of the Executive branch . . .."  Brief for the Petitioners at 31 n.24, Kleppe v. Sierra Club, 427 U.S. 390 (1976) (Nos. 75-552 & 75-561).

since we decide this case on standing grounds, these questions and related ones cannot be answered now.