# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 9, 2021        Decided August 9, 2022

No. 20-1489

OGLALA SIOUX TRIBE AND ALIGNING FOR RESPONSIBLE
MINING,
PETITIONERS

v.

U.S. NUCLEAR REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

POWERTECH (USA), INC.,
INTERVENOR

On Petition for Review of Orders
of the Nuclear Regulatory Commission

*Jeffrey C. Parsons* argued the cause for petitioners. With
him on the briefs were *Roger Flynn* and *Travis Stills*.

*James E. Adler*, Senior Attorney, U.S. Nuclear Regulatory
Commission, argued the cause for respondents. With him on
the brief were *Justin D. Heminger*, Attorney, U.S. Department
of Justice, and *Andrew P. Averbach*, Solicitor, U.S. Nuclear
Regulatory Commission.

*Christopher S. Pugsley* argued the cause for intervenor-respondent Powertech (USA), Inc. With him on the brief was *Anthony J. Thompson*.

Before: WILKINS, RAO, and JACKSON,[*] *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: The Oglala Sioux Tribe and its non-profit association Aligning for Responsible Mining seek review of the Nuclear Regulatory Commission's decision to grant Powertech (USA), Inc., a source material license to extract uranium from ore beds in South Dakota. The Tribe maintains that the Commission failed to meet its obligations under the National Environmental Policy Act and the National Historic Preservation Act. We deny the Tribe's petition because the Commission adequately complied with the relevant statutory and regulatory requirements.

## I.

### A.

Powertech sought to extract uranium from the Dewey-Burdock area, which spans over 10,000 acres in South Dakota and sits atop aquifers laced with uranium-rich ore beds. To remove the uranium, Powertech proposed using a process called "*in situ* recovery," which involves pumping an aqueous solution into underground ore beds to dissolve uranium; pumping the resulting solution back to the surface; and separating out the uranium for later processing into nuclear fuel. Powertech also planned to install monitoring wells to

---

[*] Circuit Judge, now Justice, Jackson was a member of the panel at the time the case was argued but did not participate in the opinion.

ensure its operations did not adversely affect the surrounding water quality.

Before beginning this project, Powertech was required to secure a license from the Commission. *See* 42 U.S.C. §§ 2014(z)(1), 2092 (prohibiting the transfer, delivery, or receipt of "source material" like uranium "after removal from its place of deposit in nature" without a license). The Commission's licensing process implicates a series of intersecting statutory and regulatory requirements.

The Atomic Energy Act of 1954 ("AEA"), Pub. L. No. 83-703, 68 Stat. 919 (codified as amended at 42 U.S.C. § 2011 *et seq.*), and its implementing regulations set forth the Commission's procedures for licensing. When the Commission receives a license application, it publishes a notice of the proposed action in the Federal Register. 10 C.F.R. § 2.105. If a party seeking to intervene in the process can show it would be impacted by the license and that there is at least one genuine and material dispute on a factual or legal issue, the Commission must grant the intervenor a hearing. 42 U.S.C. § 2239(a)(1)(A); 10 C.F.R. § 2.309(a), (d), (f)(1). The Commission may delegate these adjudicatory responsibilities to a three-member Atomic Safety and Licensing Board ("Licensing Board"), 42 U.S.C. § 2241(a); 10 C.F.R. § 2.321, the decisions of which are reviewable by the Commission, 10 C.F.R. §§ 2.341, 2.1212. The Commission appointed a Licensing Board to adjudicate challenges to Powertech's license, and the Tribe intervened in those proceedings.

The licensing process also requires the Commission to comply with the National Environmental Policy Act ("NEPA"), Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*). NEPA requires all federal agencies proposing a "major Federal action[] significantly affecting the human environment" to prepare "a

4

detailed statement" analyzing the impacts of that action. 42 U.S.C. § 4332(2)(C). This environmental impact statement ("EIS") must discuss adverse impacts "which cannot be avoided," "alternatives to the proposed action," long- and short-term effects, and "any irreversible and irretrievable commitments of resources" involved in the action. *Id.*; *see also* 10 C.F.R. § 51.20(b)(8) (specifying an EIS is required when issuing a source material license for uranium extraction). The Commission must publish a notice of intent to prepare an EIS, and it must conduct an "appropriate scoping process" with those affected by the proposed action to determine the issues and impacts that will be analyzed in the EIS. 10 C.F.R. §§ 51.26(a), 51.27(a), 51.28, 51.29(a). In particular, the Commission must invite "[a]ny affected Indian tribe" to participate in the scoping process, *id.* § 51.28(a)(5), and analyze "significant problems and objections raised by" those tribes in the EIS, *id.* § 51.71(b); *see also id.* § 51.90.

Powertech's license also implicated Section 106 of the National Historic Preservation Act ("NHPA"), which requires an agency, "prior to the issuance of any license, [to] take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108; *see also* NHPA, Pub. L. No. 89-665, § 106, 80 Stat. 915, 917 (1966). "Historic property" is defined capaciously to include "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places]" or any "artifacts, records, and material remains relating" to such. 54 U.S.C. § 300308. Before issuing a license, the Commission must "consult with any Indian tribe … that attaches religious and cultural significance to historic properties that may be affected" by the license, giving tribes a "reasonable opportunity" to identify concerns and help resolve any adverse effects. 36 C.F.R. § 800.2(c)(2)(ii). In light of the substantial overlap between the NHPA and NEPA inquiries, an EIS

"should include consideration of the … likely effects on historic properties." *Id.* § 800.8(a)(1); *see also id.* § 800.8(c) (allowing agencies to use the NEPA process in lieu of the normal Section 106 process).

## B.

With respect to NEPA and NHPA compliance, the agency[1] had already prepared a "generic" EIS in 2009 to address the environmental impacts of *in situ* recovery methods within the broader region in which the Dewey-Burdock Project is located. The agency was also required to create a supplemental EIS to address the specific impacts of Powertech's project. *See* 10 C.F.R. §§ 51.20(b)(8), 51.92. Only the supplement is at issue in the Tribe's petition. The agency initiated the EIS process by inviting twenty tribes that could be affected by Powertech's operations and requested assistance with identifying cultural and historical resources, including sites, objects, and other resources that carry cultural or religious significance. The Oglala Sioux Tribe was among those invited to participate.

By 2012, the agency and participating tribes settled on several preliminary conclusions. First, the tribes' involvement was essential as they possessed an "intimate cultural knowledge" of the Dewey-Burdock area and could identify "not only site-specific physical impacts, but intangible impacts to the integrity of the area from cultural, historical, spiritual, and religious perspectives." Second, it was necessary to survey

---

[1] While these steps in the AEA, NEPA, and the NHPA have been delegated to various Commission staff, we refer to these actions as those of the agency or Commission because the Commission is ultimately responsible for complying with statutory and regulatory requirements.

the area to identify those impacts. The Oglala Sioux Tribe disagreed, however, with respect to the methods for surveying the Dewey-Burdock area. When negotiations over the survey broke down, the Commission issued a draft EIS for public comment in late 2012 and explained it would later survey the area and supplement the EIS as necessary.

In 2013, the Commission conducted a field survey of the Dewey-Burdock area with seven participating tribes ("2013 Survey") and received reports from three tribes identifying cultural resources and historic properties in the area. The Oglala Sioux Tribe refused to participate because it disapproved of the 2013 Survey's methods and timing, as well as the amount of compensation provided for participating. Using the reports from the other tribes, the Commission prepared and issued a final EIS in January 2014. A few months later, it issued Powertech a license and finalized a "programmatic agreement" that established a protocol for dealing with NHPA historic properties discovered after Powertech begins operating. *See* 36 C.F.R. §§ 800.4(b)(2), 800.14(b) (permitting the Commission to create protocols to identify and protect historic properties after the issuance of a license).

## C.

The Tribe intervened before the Licensing Board assigned to Powertech's application and raised numerous challenges to the application and the agency's NEPA and NHPA processes. The Board found only some of the Tribe's contentions merited a hearing, and later found most of those claims meritless. The Board determined, however, that the license was issued without individually consulting the Tribe as required by the NHPA and without evaluating the Tribe's cultural resources in the EIS as required by NEPA. The Commission affirmed the Board's finding of NEPA and NHPA violations but left the license in

place because the Tribe had failed to show "irreparable harm."[2] *See Oglala Sioux Tribe v. NRC* (*Oglala Sioux I*), 896 F.3d 520, 522–23 (D.C. Cir. 2018); *see also id.* at 532–33 (rejecting the Commission's "irreparable harm" standard and remanding without vacatur of the license).

The agency sought to remedy the NEPA and NHPA deficiencies by meeting with the Tribe, teleconferencing, and exchanging letters. Eventually, the agency offered to conduct another survey. But the Tribe maintained its objections, leading the agency to abandon its efforts, return to the Licensing Board, and argue it had done enough to satisfy NEPA and the NHPA. In its 2017 decision, the Board partially agreed, finding the Commission had reasonably consulted with the Tribe for NHPA purposes but still needed to work with the Tribe to identify cultural resources under NEPA.

By March 2018, the agency and the Tribe had not agreed to a specific survey method, but they had agreed to an overall approach that involved a qualified contractor, other Lakota Sioux tribes, tribal elders, and iterative opportunities to survey the Dewey-Burdock area ("March 2018 Approach"). In June, however, the Tribe switched course and proposed a different approach that would have cost over $2 million to execute. The agency rebuffed the Tribe's proposal and returned to the Board, arguing NEPA was satisfied. The Board concluded that while the March 2018 Approach was reasonable and not negotiable going forward, that Approach did not include a specific survey

---

[2] Because agency proceedings were still pending, we did not reach the merits of the NEPA and NHPA determinations in *Oglala Sioux I*. *See* 896 F.3d at 527. On remand, the Commission left Powertech's license in place, but required Powertech to report 60 days in advance of taking any action that would require a license to perform, avoiding any potential harm to the Tribe's cultural resources.

method. Accordingly, the agency had to resume negotiations with the Tribe to establish a survey method.

The agency and the Tribe unsuccessfully attempted to reach accord yet again. In February 2019, the agency's contractor proposed a survey methodology that included a blend of scientific methods used in other tribe-related surveys, software to accurately document site locations, oral interviews to supplement field observations, detailed steps to survey the area, and a synthesized report that would explain the results ("February 2019 Methodology"). The Tribe rejected that methodology and tried instead to renegotiate the March 2018 Approach and raise NHPA issues already resolved by the Board.

In its fifth and final decision, the Licensing Board reaffirmed the reasonableness of the March 2018 Approach and found that the February 2019 Methodology was reasonable as well. Even though the agency had not carried out its survey, the Board also decided the agency had satisfied NEPA because the Tribe's intransigence made its cultural resource information, in effect, unavailable. The Board further reasoned that there was no need for the agency to amend the EIS to explain the unavailability of this information because the Board's administrative decisions had adequately supplemented the EIS. The Commission affirmed the Board's decisions, and the Tribe petitioned this court for review.

## II.

The AEA confers jurisdiction to review the Commission's final orders under the familiar standards outlined in the Administrative Procedure Act ("APA"). *See* 42 U.S.C. § 2239(b)(1); *see, e.g.*, *Massachusetts v. NRC*, 924 F.2d 311, 332 (D.C. Cir. 1991). Those standards also govern our review of the Tribe's NEPA and NHPA challenges. *See United*

*Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019). We will therefore set aside the Commission's determinations if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with" the AEA, NEPA, or the NHPA. *See* 5 U.S.C. § 706(2)(A). Under these standards, we do not supplant an agency's "technical judgments and predictions" so long as the agency's decision is "reasoned and rational." *Blue Ridge Env't Def. League v. NRC*, 716 F.3d 183, 195 (D.C. Cir. 2013) (cleaned up).

III.

The Tribe maintains that the Commission failed to comply with NEPA's requirements. NEPA is a purely procedural statute that "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Agencies may decide that "other values outweigh the environmental costs" and may move forward with a proposed action so long as they undergo the necessary process. *Id.* Our role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) (cleaned up). We apply these standards to the Tribe's arguments regarding the Commission's failure to conduct a formal scoping of the project's impact, and the adequacy of the EIS with respect to the Tribe's cultural resources, the hydrogeologic effects of the project, the disposal of byproduct material, and mitigation strategies.

A.

At the outset of the NEPA process, Commission regulations require the agency to conduct an "appropriate scoping" of a project's environmental impact. 10 C.F.R.

§ 51.26(a). Scoping allows the agency, among other things, to define the proposed action by identifying significant issues and filtering out those that are peripheral. *Id.* § 51.29(a)(2)–(3). The agency must also invite "[a]ny affected Indian Tribe" to participate in the scoping process and must share a summary of its conclusions with those who participated in the process. *Id.* §§ 51.28(a)(5), 51.29(b). It is undisputed that the agency never formally engaged in scoping nor provided a summary of its findings. The Board initially rejected the Tribe's request for a hearing on scoping because it thought the agency's supplemental EIS was exempt from that process. The Commission disagreed but thought the Board's error was harmless—the Tribe had "not demonstrated harm or prejudice resulting from the lack of a separate, formal scoping process on the site-specific [EIS]."[3]

Before us, the Tribe renews this scoping challenge. We need not decide the merits of this claim, however, because even assuming the Commission erred in omitting a formal scoping analysis, such error was harmless. Under the APA, courts take "due account … of the rule of prejudicial error" when reviewing agency action. 5 U.S.C. § 706. We have applied this rule in the NEPA context when the agency has undertaken the required analysis but "failed to comply precisely with NEPA procedures." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C.

---

[3] In *Oglala Sioux I*, we determined the Commission could not require a heightened showing of "irreparable harm," but we left open whether there was some "version of a harmless error rule that the Commission may apply." 896 F.3d at 538. The Tribe argues the Commission has no authority to make a harmlessness finding under NEPA. Because we conclude the agency's failure to conduct a formal scoping process was harmless error under the APA, we do not reach the question of whether the Commission has authority to excuse violations of NEPA on similar grounds.

Cir. 2006); *see also Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (explaining that harmless error review requires the "case-specific application of judgment, based upon examination of the record"). Here the agency placed notices in local papers, received comments from those notices, and met with various interested parties—including tribal authorities—to gather information on the Dewey-Burdock Project before drafting an EIS. As the EIS explains, "[t]he purpose of these meetings was to gather additional site-specific information to support the [Commission's] environmental review." Even if these efforts did not precisely satisfy formal scoping requirements, the agency's efforts accomplished the same objectives, and the Tribe makes no argument that the failure impacted the project's actual scope. *See* 10 C.F.R. § 51.29(a). In the context of this site-specific EIS, there is no evidence that the absence of formal scoping affected the agency's NEPA process or resulted in any prejudice to the Tribe. The Tribe's petition cannot succeed on this ground.

## B.

The Tribe next argues the Commission failed to satisfy NEPA because it did not adequately address the Tribe's cultural resources in the EIS. The parties do not question the Tribe's outsized historical connection to the Dewey-Burdock area, and the importance of considering those resources in reviewing Powertech's application. But the Commission affirmed the Board's finding that this information was effectively unavailable because of the Tribe's intransigence. This finding was made in published orders, but never incorporated into the EIS.

NEPA requires agencies to take "a 'hard look' at 'every significant aspect of the environmental impact' of a proposed major federal action." *Indian River Cnty.*, 945 F.3d at 533 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97

(1983)). An agency does not necessarily violate NEPA, however, when it is unable to acquire information relevant to its analysis. Regulations promulgated by the Council on Environmental Quality ("CEQ") state that when important information is "unavailable," agencies can satisfy NEPA by explaining in the EIS why the information was unavailable and what actions the agency took to address that unavailability. 40 C.F.R. § 1502.22(b) (2020).[4]

The Tribe asserts the Commission is bound by Section 1502.22's requirement that an unavailability statement be within an EIS, but the Commission has maintained that as a historically independent agency, CEQ regulations are only non-binding guidance. We need not reach this thorny question[5] because even assuming the EIS failed to satisfy NEPA's requirements as interpreted by CEQ, we have repeatedly held that remand is unnecessary if an agency has incorporated the required analysis into a publicly accessible decision before the EIS is challenged in federal court. *NRDC v. NRC*, 879 F.3d 1202, 1211 (D.C. Cir. 2018).

For example, when the Commission failed to adequately discuss aquifer restoration in an EIS, we concluded that it was sufficient for the Board to evaluate that information during a subsequent hearing and present its findings in a publicly accessible order. *Id.* at 1209–11. We explained the petitioners "ha[d] not pointed to any harmful consequence of the

---

[4] This provision has since been re-codified at Section 1502.21. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,366–67 (Jul. 16, 2020).

[5] *See, e.g.*, *Food & Water Watch v. U.S. Dep't of Agriculture*, 1 F.4th 1112, 1119 (D.C. Cir. 2021) (Randolph, J., concurring) (questioning CEQ's authority to promulgate binding regulations).

supplementation" in this manner, and there was "nothing to be gained by remanding the matter to the Commission … to consider the same information again." *Id.* at 1210. Moreover, "common sense counsel[ed] against prolonging this dispute by requiring an utterly pointless proceeding on remand." *Id.* at 1212; *see also Friends of the River v. FERC* (*FOTR*), 720 F.2d 93, 106–08 (D.C. Cir. 1983) (including the required analysis in a publicly accessible opinion "composed after due investigation and before the matter was brought to court" made remand to supplement the EIS "pointless" and an "insistence on form").

For similar reasons, even if we assume the EIS inadequately accounted for the unavailability of the Tribe's cultural resources, remanding for the agency to supplement the EIS is unnecessary because the Licensing Board's decisions, which were summarily affirmed by the Commission, satisfied any violation of NEPA. The Board explained the Tribe's cultural resource information was relevant and that of the tribes affected, "[t]he Oglala Sioux Tribe ha[d] shown it has the most direct historical, cultural, and religious ties to the area." The Board further explained the information was unavailable because of "the Tribe's demonstrated unwillingness or unjustifiable failure to work" with the Commission, with no "reasonable assurance" of a future accord. Without the Tribe's participation, its cultural resource information "would not otherwise be obtainable" and thus was unavailable.

In short, the agency explained the unavailability of this information and presented the substance of its findings in publicly accessible decisions after on-the-record hearings. The Tribe does not dispute the reasonableness or accuracy of the Board's explanations but maintains only that they had to be within the EIS. In these circumstances, a remand for the agency

to update its EIS and repeat the Board's unchallenged findings would be "utterly pointless." *See NRDC*, 879 F.3d at 1212.

The Tribe contends that *NRDC* and *FOTR* do not apply because, in those cases, the agencies eventually conducted the required NEPA analysis, while here the Commission never conducted a survey for the Tribe's cultural resources. Yet remand was unnecessary in those cases because the agency had remedied the specific NEPA failure alleged by the petitioners. *NRDC*, 879 F.3d at 1209–11; *FOTR*, 720 F.2d at 106. Similarly, the Tribe alleged a failure to include an unavailability statement in the EIS, and that specific failure was remedied by the Board's publicly accessible orders, making remand unnecessary.

The Tribe maintains in the alternative that some information about its cultural resources was available since the Commission could have conducted oral interviews with tribal members. But it is clear from the parties' course of dealing that oral interviews alone were never considered to be an adequate means of gathering the required information. Rather, the parties agreed that only the Tribe could accurately identify its cultural resources and that a survey was necessary to adequately identify those resources. Oral interviews would then be used to supplement the Commission's understanding *after* a preliminary survey. Even the Tribe's alternative proposal placed oral interviews after, and supplemental to, an initial survey. The EIS also suggested that oral interviews alone would not be sufficient based on an earlier study of the area that found that "most of the tribal members interviewed knew their people had regular ceremonial, cultural, and religious activity in the Black Hills … however, no one could pinpoint present cultural, ceremonial, or religious use in the proposed area." Similarly, in affidavits tribal members averred general

knowledge about cultural resources in the area but did not identify specific resources.

Given this course of dealing, the Board determined that the survey and oral interviews were an integrated approach to discovering the Tribe's cultural resources and concluded that, without a survey, the information was unavailable. The Commission affirmed, explaining that oral interviews alone "would not have satisfied [the] criteria that the parties agreed would be necessary" to identify cultural resources. Based on the record and the parties' understanding, we cannot say the agency committed a "clear error of judgment." *See Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

The Tribe also faults the Commission for not spending enough time or money on a survey and effectively forcing the Tribe to subsidize it. Yet the Tribe cites no authority requiring the agency to either compensate the Tribe for its participation or to conduct a survey in a particular manner. NEPA requires agencies to "utilize a systematic, interdisciplinary approach" to identify and analyze environmental concerns, but agencies have leeway to choose how to give "appropriate consideration" to environmental concerns and "economic and technical considerations." 42 U.S.C. § 4332(2)(A)–(B). That the agency exercised its discretion to use compensated surveys as a method of gathering cultural resources does not entitle the Tribe to demand more compensation or a different survey method. Nor does the record support the Tribe's assertion that the Commission somehow "foist[ed]" its NEPA obligations onto the Tribe and required the Tribe to subsidize the survey. *Cf. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1048 (D.C. Cir. 2021). It planned to expend substantial resources on the survey and coordinated with Powertech to provide additional compensation for tribal members that participated in the survey.

The Tribe fails to make out a NEPA violation requiring remand, and we find the Commission's efforts to gather cultural resources information were reasonable.

C.

The Tribe next faults the Commission's analysis of hydrogeologic data at the Dewey-Burdock Project. First, the Tribe argues that the agency impermissibly delayed analyzing water quality baseline data because it allowed Powertech to gather data after the license was issued. This deferral, the Tribe contends, violates NEPA by allowing the agency to "act first and comply later." *See Oglala Sioux I*, 896 F.3d at 523. While the agency and Powertech agreed to post-licensing data collection, that fact alone does not show the pre-licensing hydrogeological analysis was insufficient. It is certainly possible for an agency to adequately analyze hydrogeologic data in an EIS and also contemplate further analysis during operations. Here, the EIS included meticulous analysis of contaminant levels present in the area's groundwater and set forth plans for restoring water quality using pre-licensing data. Because water quality baselines cannot be "establish[ed] definitively … until an *in situ* leach well field has been installed," it was not unreasonable for the agency to augment pre-licensing data with further testing after Powertech installed its well field but before it began operations. *See Hydro Res., Inc.*, 63 N.R.C. 1, 6 (2006).

The Tribe also argues the Commission failed to analyze the impacts of preexisting boreholes in the Dewey-Burdock area and left these issues for after the license was granted. We disagree. The record demonstrates the Commission gave these impacts a hard look in the EIS: the agency identified 4,000 previously drilled exploration boreholes in addition to the 115 drilled by Powertech, analyzed the impact of those boreholes on vertical leakage, and outlined steps to mitigate those effects.

It was also entirely reasonable for the Commission to require that Powertech fix improperly plugged historic boreholes after receiving a license.

As to the hydrogeologic concerns raised by the Tribe, we find the agency "adequately considered and disclosed the environmental impact of its actions." *See Indian River Cnty.*, 945 F.3d at 527 (cleaned up).

## D.

The Tribe also raises a series of arguments challenging the Commission's treatment of the disposal of byproduct material generated from uranium extraction. On three separate occasions, the Tribe argued before the Licensing Board that Powertech's application and the EIS inadequately addressed byproduct material. On each occasion the Board refused to hold a hearing on those contentions, and the Commission affirmed. The Tribe now argues the Board was required to hold a hearing to address byproduct material because the issues presented a genuine legal dispute. *See* 10 C.F.R. § 2.309(f)(1)(vi).

The Tribe first argues the agency erroneously issued Powertech a license even though its application lacked a site-specific disposal plan for byproduct material. This argument is foreclosed by the plain text of the Commission's regulations. Although some license applications must include a proposal for byproduct disposal, *id.* pt. 40 app. A, this requirement did not apply to Powertech's application. It applies only for "sites *formerly associated* with [uranium] milling." *Id.* § 40.31(h) (emphasis added). As no one disputes the Dewey-Burdock Project is a new uranium mining site, the Commission now argues that Section 40.31(h) forecloses the Tribe's argument.

Although the Commission's interpretation of Section 40.31(h) is plainly correct, this was not the reason the Commission relied on below. In affirming the denial of a

hearing, the Commission explained that the disposal plan requirement and surrounding regulations in Appendix A "are inapplicable to *in situ* recovery facilities."[6] We review an agency's actions in light of the reasons offered at the time of the agency's decision, not its post hoc rationale offered in litigation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, however, the meaning of the regulation is entirely clear and "there is not the slightest uncertainty as to the outcome of [the] proceeding on remand," so we "can affirm … on grounds other than those provided in the agency decision." *Envirocare of Utah, Inc. v. NRC*, 194 F.3d 72, 79 (D.C. Cir. 1999) (cleaned up); *see also Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 & n.1 (D.C. Cir. 2011) (noting this "limited exception" to the *Chenery* principle). Affirmance in such cases "entails neither an improper judicial invasion of the administrative province nor a dispensation of the agency from its normal responsibility." *Envirocare*, 194 F.3d at 79 (quoting Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 DUKE L.J. 199, 211). When an agency raises a purely legal argument for the first time in litigation, a court may consider that argument if it is both clearly correct and would render remand pointless under the harmless error standard. *See* 5 U.S.C. § 706. The Dewey-Burdock Project is indisputably not a former uranium milling site, and therefore a remand for the Commission to address this issue would be pointless.

---

[6] The Commission relied on *Hydro Resources, Inc.*, 50 N.R.C. 3, 8–9 (1999), to conclude that the relevant regulations apply only to traditional uranium mining, not *in situ* recovery operations. The Tribe waited until its reply brief to challenge the Commission's reliance on this decision and thus forfeited its opportunity to contest this aspect of the Commission's reasoning. *See Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 10 n.9 (D.C. Cir. 2011) (per curiam).

The Tribe next argues "[t]he EIS does not contain [a] NEPA analysis of the disposal proposal, foreseeable impacts, alternatives, or mitigation measures" related to byproduct material.[7] We disagree. In the EIS, the agency thoroughly analyzed solid byproduct material by calculating the total byproduct accumulation of both Powertech's preferred and alternative disposal methods; explaining the process for temporary storage and transfer to a licensed disposal facility; identifying White Mesa as the presumed disposal facility and ensuring that facility has the capacity to accept Dewey-Burdock byproduct material; acknowledging that White Mesa still needed state authorization to accept this material; determining that transportation impacts will be small regardless of which disposal site Powertech uses; explaining the low risks and logistics of transporting byproduct material to White Mesa in accordance with Department of Transportation regulations; and mitigating any potential risk of improper storage by requiring Powertech to acquire and maintain a disposal contract before beginning operations. This analysis more than adequately satisfies NEPA's "hard look" requirement and undercuts the Tribe's claims that the agency failed to address byproduct material in the EIS.

The Tribe also maintains the EIS did not include an analysis of the impacts of Powertech failing to secure a disposal contract before beginning operations. NEPA requires an analysis of only those impacts reasonably likely to occur, not impacts that are hypothetical. *See Indian River Cnty.*, 945 F.3d at 533 ("NEPA … requires that an agency take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action.") (cleaned up). Yet any impacts related to Powertech's

---

[7] The Commission argues that the Tribe failed to raise these arguments below, but the record demonstrates otherwise.

failure to secure a disposal contract are purely hypothetical because the conditions placed on Powertech's license prohibit initiating operations without first securing a disposal contract. Without a disposal contract, there will be no operations, no byproducts, and no related environmental impacts. Accordingly, analysis on this issue was not required.

We are also not persuaded by the Tribe's concerns that the EIS did not include an analysis of the impact of stranded byproduct material at the Dewey-Burdock Project should the disposal contract fall through after operations have begun. The Tribe relies on *New York v. NRC*, in which we found the Commission ran afoul of NEPA by failing to "explain the environmental effects of a failure to secure a permanent facility" for spent nuclear fuel. 681 F.3d 471, 479 (D.C. Cir. 2012). But the facts of that case are easily distinguishable as "there [was] not even a prospective site for a [disposal] repository, let alone progress toward the actual construction of one." *Id.* at 474. By contrast, the Commission identified the likely disposal site for Powertech's byproduct material, and the Tribe only speculates, with no record support, that Powertech would be unable to secure a replacement disposal contract if necessary.

Because none of the Tribe's arguments related to byproduct material raises a genuine dispute of law, the agency was not required to hold an evidentiary hearing to address them.

E.

The Tribe's final NEPA challenges concern the adequacy of the mitigation analysis in the EIS. Discussing mitigation measures is an important aspect of an EIS because NEPA requires agencies to "discuss the extent to which adverse effects can be avoided" in "sufficient detail to ensure that

environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352. Fairly evaluating mitigating strategies does not, however, require an agency to have "actually formulated and adopted … a fully developed plan that will mitigate harm before an agency can act." *Id.* at 352–53. Like other aspects of an agency's NEPA analysis, mitigation efforts must be "adequately considered." *See Indian River Cnty.*, 945 F.3d at 527. An agency cannot simply leave mitigation measures as "TBD," relying on "anticipated-but-unidentified" measures without further analysis. *Am. Rivers v. FERC*, 895 F.3d 32, 54 (D.C. Cir. 2018). The Commission easily satisfied its obligation here.

The Tribe faults the agency for simply listing mitigation measures without discussing their efficacy. The mitigation analysis in the EIS, however, was not limited to the list referenced by the Tribe. As the Board and Commission pointed out in their decisions, the Tribe had "completely overlooked" other portions of the EIS, "which contained extensive analysis of mitigation measures" relating to issues such as "wildlife protection, wellfield testing, air impacts, and historical well hole plugging and abandonment." Nonetheless, in its petition for review, the Tribe continues to ignore the comprehensive discussion of mitigation throughout the EIS and instead focuses only on the EIS's summary list of mitigation measures. The Tribe fails to engage with the agency's actual mitigation analysis, and from our review of the record, the agency more than satisfied NEPA's "hard look" requirement.

We also disagree with the Tribe that the EIS improperly deferred a mitigation analysis of cultural and historic resources, groundwater quality, air impacts, waste disposal, wildlife protection, and storm water control until after Powertech obtained its license. For each of the Tribe's identified issues, the EIS extensively analyzed both impacts and mitigation

measures. Ignoring these analyses, the Tribe relies on obscure transcript quotes, letters, and responses to draft EIS comments. But these excerpts do not suggest that the agency deferred its NEPA mitigation analysis on any of the identified topics. Many of these excerpts even cross-reference the substantive sections of the EIS discussing relevant mitigation measures. More to the point, an agency does not run afoul of NEPA when it adequately analyzes mitigation measures and then provides that it will continue to develop those plans after publishing an EIS. And where, as here, the agency carefully analyzes environmental impacts and ways to reduce or avoid those impacts, additional efforts to mitigate impacts in the future would seem to further the purposes of NEPA, rather than to constitute a procedural violation.

\* \* \*

In sum, the Tribe fails to demonstrate any NEPA deficiencies that require setting aside the Commission's decisions.

## IV.

The Tribe raises a series of challenges under the NHPA, but these do not merit remand because the Commission satisfied its statutory obligations.

First, the Tribe argues the agency did not adequately consult with the Tribe. NHPA regulations require the agency to give the Tribe a "reasonable opportunity" to identify historic properties, to express concerns regarding those properties, and to participate in the resolution of those concerns. 36 C.F.R. § 800.2(c)(2)(ii)(A). The Commission invited the Tribe's participation in the 2013 Survey and engaged with the Tribe over a two-year period as described above. The Tribe's refusal to participate in the 2013 Survey and its challenges to the agency's methodology do not vitiate the reasonable

opportunity the Tribe was, in fact, afforded. The Commission satisfied its consultation obligations under the NHPA.

Second, the Tribe maintains the agency impermissibly failed to survey the Dewey-Burdock area for the Tribe's historic properties. NHPA regulations permit an agency to conduct a survey as part of its efforts to identify historic properties, but agencies are free to use a survey or some other method to gather information. *See id.* § 800.4(b)(1) (agency's identification efforts "*may* include … [a] field survey") (emphasis added). An agency may therefore satisfy its NHPA obligations without conducting a survey or conducting it in a specific way.

Finally, the Tribe suggests the agency impermissibly postponed identifying historic properties until after Powertech had begun operations. NHPA regulations, however, expressly contemplate this approach. The Commission can employ a phased identification and evaluation of historic properties through a programmatic agreement "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." *Id.* § 800.14(b)(1)(ii); *see also id.* § 800.4(b)(2). The agency here recognized that some tribal historic properties could be identified only after Powertech broke ground and therefore sought to create a process whereby newly discovered properties could be protected and evaluated for listing on the National Register of Historic Places. The Commission reasonably satisfied its obligations under the NHPA's regulatory scheme.

\* \* \*

For the foregoing reasons, we deny the Tribe's petition for review.

*So ordered.*